**EXHIBIT 1**

Att: Andy Tarshis

**Execution Copy**

## LICENSE AGREEMENT

   **AGREEMENT** made as of the ___ day of September, 2006, by and between IP Holdings LLC, a Delaware limited liability company, with offices at 103 Foulk Road, Wilmington, Delaware 19803 ("Licensor"), and Exportaciones del Futuro S.A. de C.V., a Mexican corporation, with offices Enrique Wallon # 428 Primer Piso, Col. Rincon del Bosque, 11580 Mexico, D.F Mexico ("Licensee").

### WITNESSETH:

   **WHEREAS**, Licensor is the owner of the mark "MUDD®" (the "**Licensed Mark**"); and

   **WHEREAS**, Licensee desires to be granted the right to use the Licensed Mark in the Republic of Mexico (the "**Territory**") in connection with the manufacture, marketing, distribution and sale of the products set forth on <u>Schedule A</u> ("**Products**");

   **NOW, THEREFORE**, in consideration of the mutual covenants hereinafter set forth, Licensor and Licensee do hereby respectively grant, covenant and agree as follows:

1.   Grant of License

   1.1  (a)  Licensor hereby grants to Licensee an exclusive license (except as otherwise provided herein) throughout the Territory to use the Licensed Mark in connection with the manufacture, distribution, advertising, marketing, promotion and sale solely of Products approved by Licensor for use by Licensee pursuant to this Agreement.

      (b)  "Products" that are distributed and sold by Licensee under and in accordance with the terms of this Agreement shall be referred to collectively herein as "**Articles**." Also, the term "**Category**" means any product category of Articles covered hereby, e.g., women's sportswear, men's underwear, etc.

   1.2  (a)  Licensor reserves all rights to the Licensed Mark except those that are specifically granted to Licensee under this Agreement and Licensor may exercise its rights at any time.

      (b)  Nothing herein shall be deemed to prevent Licensor or its affiliates from manufacturing or having manufactured Products bearing the Licensed Mark in the Territory, provided that such Products are not sold to customers located in the Territory except as otherwise permitted hereunder.

   1.3  The rights granted to Licensee hereunder do not include the right to operate "Mudd" retail stores or boutiques.

   1.4  Licensee shall use its best efforts to exploit the rights herein granted throughout the Territory and to sell the maximum quantity of Articles therein consistent with the high standards and prestige represented by the Licensed Mark. However, Licensee shall set its prices for Articles in its sole discretion.

   1.5  Licensee shall not export Articles from the Territory or sell Articles to any entity that it knows or has reason to believe intends to export Articles from the Territory.

2.   Term

   2.1  The initial term of this Agreement is approximately three years and nine months commencing as of the date hereof and continuing through December 31, 2009.

  2.2 Licensee may renew this Agreement for one additional term of 3 years, provided that (a) Licensee notifies Licensor of its desire to renew this Agreement no later than December 31, 2008 (the "**Renewal Notice**"), (b) Licensee is not in default of the terms of this Agreement and (iii) "Net Wholesale Sales" (as defined in ¶7.1) that accrue for the second "Annual Period" (as defined in ¶2.3) is not less than $2,500,000US for such Annual Period.

  2.3 The period from the date hereof through December 31, 2007 and each 12-month period commencing on each January 1st thereafter during the term of this Agreement shall be referred to herein as an "**Annual Period**."

3. Development of Articles

  3.1 Licensee shall submit to Licensor materials, designs, sketches, colors, fabric samples, tags, labels and packaging from which Licensor may select those, if any, that Licensor approves for use in connection with Articles. In its sole discretion, Licensor shall approve or disapprove the items submitted as aforesaid and shall discuss with Licensee any modifications or alterations thereof that it requires. Any such approval by Licensor shall be given prior to use of such items by Licensee.

  3.2 All designs, sketches and other materials provided or approved by Licensor shall be used by Licensee solely in connection with the manufacture, distribution and sale of Articles, and the advertising, marketing and promotion of Articles in the Territory and pursuant to this Agreement. Whether or not Licensee chooses to use any such designs, sketches or other materials, Licensor may use and permit others to use them in any manner it desires, provided that such use does not conflict with any rights granted to Licensee hereunder.

  3.3 Licensee shall be responsible for making all samples of and Licensee shall bear all costs in connection therewith.

4. Quality Control

  4.1 The contents and workmanship of Articles shall be at all times of a high quality consistent with the quality standards prescribed by Licensor from time to time and all Articles shall be distributed and sold with packaging and sales promotion materials appropriate for high quality Products.

  4.2 The styles, designs, packaging, contents, workmanship and quality of all Articles must be approved by Licensor prior to the offering for sale, sale or distribution thereof. Licensor may take any reasonable action that it deems necessary to ensure that Articles manufactured or sold hereunder are consistent with the reputation and prestige of the Licensed Mark as a designation for high quality products.

  4.3 Before offering for sale, selling or distributing any Article, Licensee shall deliver to Licensor for its approval, free of charge, one prototype sample of each such Article together with the tags, labels and packaging to be used in connection therewith. Also, upon Licensor's request, Licensee shall submit to Licensor, without charge, then current production samples of each Article (up to 25 per style) produced hereunder so that Licensor may assure itself of the maintenance of the quality standards set forth herein. All Articles to be sold hereunder shall be at least equal in quality to the samples approved by Licensor. Licensor and its duly authorized representatives may, upon reasonable advance notice and during normal business hours, examine Articles in the process of being manufactured and inspect all facilities utilized in connection therewith.

  4.4 All Articles shall be manufactured, and all Articles shall be offered for sale, sold, labeled, packaged, distributed and advertised, in accordance with all applicable laws and regulations, including all child and other labor laws and regulations, all customs requirements

and country of origin regulations and all laws and regulations relating to health and safety, to the disclosure of information to the consumer and to the testing of Products.

4.5  Licensee shall use and display the Licensed Mark in connection with Articles and the advertising, marketing and promotion thereof, only in such form and manner as are specifically approved by Licensor. Licensee shall submit to Licensor, for its prior approval, proposed advertising, marketing and promotional copy, finished artwork for tags, labels, packaging and the like and all printed matter of any kind on which the Licensed Mark is to appear; and same shall not be used or released prior to Licensee's receipt of such approval.

4.6  After any sample, copy, artwork or other material has been approved, Licensee shall not depart therefrom without the prior approval of Licensor. If Licensor should disapprove any sample Article or any sample tag, label, packaging or the like, or any advertising, marketing, promotional or publicity material, Licensee shall neither use nor permit the same to be used in any manner.

4.7  Licensee shall establish dedicated and unique style numbers for Articles. Licensee's business documents, including purchase orders, sales orders, invoices and the like, shall reference such style numbers.

4.8  Licensee may use contractors for the production of Articles. Licensor's prior approval of a contractor shall not be required, but no prospective contractor shall be engaged until it executes and delivers to Licensee and Licensor an agreement in the form of Exhibit A. Also, Licensee's engagement of contractors shall not limit Licensee's obligations hereunder, i.e., any act or omission by a contractor that would be a breach of this Agreement if done by Licensee shall constitute a breach of this Agreement by Licensee.

4.9  In order to maintain the reputation, image and prestige of the Licensed Mark, Licensee's distribution patterns shall consist solely of those retail outlets, catalogs and Internet accounts whose location, merchandising and overall operations are consistent with the high quality of Articles and the reputation, image and prestige of the Licensed Mark and which have been pre-approved by Licensor in writing. The accounts listed on Schedule D attached hereto are hereby deemed to be pre-approved by Licensor. Licensor may disapprove of any customer, even if such customer is listed on Schedule D or has been previously approved by Licensor, if such customer diverts Articles or Licensor otherwise determines (in its reasonable discretion) that such customer does not meet its standards. Licensee may fill all confirmed orders placed by such customer that are outstanding on the date that Licensee receives the notice of disapproval, but Licensee no longer may accept any orders from such customer.

5.  Approvals

5.1  Licensor's approvals pursuant to this Agreement may be based solely on its subjective standards as to aesthetics based upon its requirements for and the reputation and prestige of products bearing the Licensed Mark and may be withheld in Licensor's reasonable discretion. Also, Licensor's approval of any Articles for inclusion in, or of any materials of any kind for use in connection with, any particular collection of Articles shall constitute approval for inclusion or for such use in connection with such collection only.

5.2  All approval requests shall be handled promptly and diligently, and all disapprovals shall be specific as to reason.

6.  Minimum Royalty

6.1  Licensee shall pay to Licensor a minimum royalty for each Annual Period (each a "**Minimum Royalty**") as set forth on Schedule B.

6.2    The Minimum Royalty payable for each Annual Period shall be paid to Licensor in four equal quarterannual installments on the first day of January, April, July and October each such Annual Period, except that, for the first Annual Period, the Minimum Royalty shall be paid as follows: $50,000 simultaneously with the execution hereof; and $24,500 on each of May 1, 2007 and August 1, 2007.

6.3    The Minimum Royalty for each Annual Period only shall be credited against the "Sales Royalty" (as provided in ¶7.1) for the same Annual Period. Under no circumstances shall any payments of Minimum Royalty hereunder be refundable.

7.    Sales Royalty

7.1    During each Annual Period, Licensee shall pay to Licensor a "**Sales Royalty**" equal to 6% of "Net Wholesale Sales" (as defined in ¶7.2).

7.2    "**Net Wholesale Sales**" means the invoiced amount of Articles shipped by Licensee or any of its affiliates, less (i) actual discounts for prompt payment actually earned and taken by customers, (ii) bona fide chargebacks, markdowns and allowances and (iii) returns. No deduction shall be made for other discounts or returns, allowances, uncollectible accounts or costs incurred by Licensee. In no event shall total deductions (exclusive of returns) during any quarter during an Annual Period exceed 20% of total gross sales during the quarter, excluding cancellations.

7.3    The Sales Royalty hereunder shall be accounted for and paid quarterly within 30 days after the end of each three-month period during the term of this Agreement, with the first such accounting and payment being for the period ending December 31, 2006. The Sales Royalty payable for each accounting and payment period for each Annual Period shall be computed on the basis of Net Wholesale Sales during such Annual Period, with a credit for any Sales Royalty and Minimum Royalty payments theretofore paid to Licensor for said Annual Period only.

7.4    During each Annual Period, Licensee guarantees that Net Wholesale Sales shall be in the amounts set forth on Schedule C.

8.    Minimum Advertising Royalty Spend

8.1    During the first Annual Period, Licensee shall expend in connection with the advertising, marketing and promotion of Articles an amount equal to at least 2% of Minimum Net Sales for such Annual Period (a "**Minimum Advertising Requirement**"). During each subsequent Annual Period, Licensee shall expend in connection with the advertising, marketing and promotion of Articles an amount equal to at least the greater of 2% of (i) Minimum Net Sales for such Annual Period and (ii) actual Net Sales during the immediately preceding Annual Period (each also a "**Minimum Advertising Requirement**").

8.2    In the event that Licensee fails to expend a sum equal to at least the Minimum Advertising Requirement for any Annual Period, Licensee shall pay to Licensor, at the time it delivers to Licensor the final "Quarterly Statement" (as defined in ¶10.1), an amount equal to the shortfall or applicable portion thereof (the "**Minimum Advertising Shortfall Payment**").

8.3    All advertising to be credited toward the Minimum Advertising Requirement must be approved by Licensor in advance. For the avoidance of doubt, advertising under this section may include Licensee's out-of-pocket costs incurred in connection with cooperative advertising required by accounts, in-store displays, trade and print advertisements, fashion shows, trade shows and the like.

9.    Payments; Currency Conversions; Withholding

9.1   All payments required of Licensee hereunder shall be made to Licensor in United States Dollars via wire transfers, or in such other manner as Licensor shall designate.

9.2   "Net Wholesale Sales" or "Net Retail Sales," as the case may be, shall be computed on the basis of the conversion rate of each applicable currency into United States Dollars as quoted in The Wall Street Journal (the "**Conversion Rate**") as of the close of business on the last business day of each accounting and payment period during each Annual Period.

9.3   If applicable, Licensee shall compute and pay, on behalf of Licensor, all taxes that any governmental authority in the Territory may impose on Licensor with respect to the payments made by Licensee to Licensor hereunder. The amount of such taxes shall be deducted from such payments. Licensee shall furnish Licensor with an official receipt (together with an English language translation thereof) promptly after each such payment of taxes. If such taxes are not paid when due, all resulting penalties and interest shall be borne by Licensee.

9.4   Licensee may not withhold payment of any Royalty on the grounds of the actual or alleged non-performance or breach of any of Licensor's obligations under this Agreement.

10.   Sales Reports and Plans

10.1   Licensee shall deliver to Licensor at the time each Sales Royalty payment is due, a statement ("**Quarterly Statement**") indicating, by month and separately for each Article, the number and invoice price of all Articles shipped during the applicable period, the amount of discounts and returns that may be deducted from gross sales and a computation of Net Wholesale Sales and the amount of Sales Royalty payable for said period in respect of Net Wholesale Sales.

10.2   Not later than 90 days prior to the end of any Annual Period, Licensee shall provide to Licensor a written plan setting forth with reasonable specificity and in good faith, the manner in which Licensee plans the sale, marketing, distribution, advertising and promotion of Articles for the following Annual Period, including but limited to, reasonable projections of Net Sales by quarter, by major customer account, sales goals and plans, planned cooperative and other advertising expenditures, and such other information as to Articles as may be reasonably requested by Licensor (each an "**Annual Business Plan**").

10.3   In addition to the Annual Business Plan, Licensee will provide Licensor with monthly forecasts of Net Wholesale Sales for each month during each Annual Period and will provide Licensor with such other information related to its business as Licensor may reasonable request from time to time.   The foregoing information may be supplied by electronic mail to an email address to be provided by Licensor from time to time.

11.   Books and Records; Audits

11.1   Licensee shall prepare and maintain complete and accurate books of account and records covering all transactions relating to this Agreement. Licensor's representatives may, from time to time during regular business hours on reasonable advance notice, during the term of this Agreement and for 2 years thereafter, audit such books of account and records and examine and copy all other documents and material in the possession or under the control of Licensee with respect to the subject matter and the terms of this Agreement.

11.2   If, as a result of any audit of Licensee's books and records, it is shown that any of Licensee's Sales Royalty payments was less than the amount that should have been paid, all payments required to be made to eliminate the discrepancy, plus interest in the amount

provided for in ¶16.1(a)(i), shall be made promptly upon Licensor's demand, and, if the discrepancy is 5% or more of the amount actually paid with respect to sales occurring during the period in question, Licensee promptly shall reimburse Licensor for the reasonable and actual cost and expenses of such audit.

12.  <u>The Licensed Mark</u>

12.1  Licensee shall not use the Licensed Mark, in whole or in part, as a corporate name, trade name or domain name and shall not use the Licensed Mark in combination with any prefix, suffix, or other modifying words, terms, designs or symbols unless approved by Licensor in writing.

12.2  Licensee acknowledges that, as between Licensee and Licensor, Licensor is the owner of all right, title and interest in and to the Licensed Mark in the Territory in any form or embodiment thereof, including as part of a domain name, and is also the owner of the goodwill attached or that shall become attached to the Licensed Mark in connection with the business and goods in relation to which the same has been, is or shall be used. Sales by Licensee shall be deemed to have been made by Licensor for purposes of trademark registration and all uses of the Licensed Mark by Licensee (including any use of the Licensed Mark in combination with any other marks, words or symbols approved by Licensor) shall inure to the benefit of Licensor. Licensee shall not do or suffer to be done any act or thing that may in any way adversely affect any rights of Licensor in and to the Licensed Mark or any registrations thereof or that, directly or indirectly, may reduce the value of the Licensed Mark or detract from its reputation.

12.3  Licensee shall execute any documents reasonably required by Licensor to confirm Licensor's ownership of all rights in and to the Licensed Mark in the Territory and the respective rights of Licensor and Licensee pursuant to this Agreement. Licensee shall cooperate with Licensor in connection with the filing and prosecution by Licensor of applications in Licensor's name to register the Licensed Mark for Products in the Territory and the maintenance and renewal of such registrations as may issue. With respect to any requirements in the Territory that mandate applications to register Licensee as a Permitted User or Registered User of the Licensed Mark or which require the recordation of this License Agreement, Licensee agrees to execute and deliver to Licensor and to such parties as Licensor shall indicate, such applications, agreements, or other documents as may be necessary and as are furnished by Licensor for such purposes.

12.4  Licensee shall use the Licensed Mark in the Territory strictly in compliance with all applicable legal requirements. Also, Licensee shall cause to appear on all Articles and on all materials on or in connection with which the Licensed Mark is used, such legends, markings and notices as may be reasonably necessary in order to give appropriate notice of any trademark, trade name or other rights therein or pertaining thereto.

12.5  Licensee shall not challenge Licensor's ownership of or the validity of the Licensed Mark or any application for registration thereof, or any trademark registration thereof, or any rights of Licensor therein. Also, Licensee shall not seek to register, as a trademark, domain name or otherwise, the Licensed Mark or any variation or simulation thereof in the Territory or elsewhere throughout the world for Products or any other products or services. Any such challenge or any attempt to register shall be a material and uncurable default hereunder. Also, the provisions of and the obligations of Licensee under this ¶12.5 shall survive the expiration or any termination of this Agreement ("**Termination**").

13. <u>Copyright</u>

13.1 Any copyright that may be created in any Article or any sketch, design, packaging, label, tag or the like designed by Licensor or designed by Licensee but incorporating the Licensed Mark shall be, as between Licensor and Licensee, the property of Licensor.

14. <u>Confidentiality</u>

14.1 Licensee acknowledges that all information relating to the business and operations of Licensor and its affiliates that it learns or has learned during or prior to the term of this Agreement, all creative concepts that Licensor provides to it and all sketches and designs received by it from, or approved for use hereunder by, Licensor are the valuable property of Licensor. Licensee acknowledges the need to preserve the confidentiality and secrecy of the foregoing and agrees that, both during and after the term of this Agreement, it shall not use or disclose same, except for such use that is permitted under this Agreement. Licensee shall take all necessary steps to ensure that use by it or by its contractors and suppliers shall preserve in all respects such confidentiality and secrecy.

14.2 Licensor acknowledges that all information relating to the business and operations of Licensor and its affiliates that it learns or has learned during or prior to the term of this Agreement is the valuable property of Licensor. Licensee acknowledges the need to preserve the confidentiality and secrecy of the foregoing and agrees that, both during and after the term of this Agreement, it shall not use or disclose same, except for such use that is permitted under this Agreement.

15. <u>Indemnity; Insurance</u>

15.1 Licensee hereby saves and holds Licensor and its respective affiliates harmless of and from and indemnifies each of them against any and all losses, liability, damages and expenses (including reasonable attorneys' fees and expenses) that they or any of them may incur or be obligated to pay, or for which they or any them may become liable or be compelled to pay in any action, claim or proceeding against them or any of them, for or by reason of any acts, whether of omission or commission, that may be committed or suffered by Licensee or any of its servants, agents or employees in connection with Licensee's performance of this Agreement. The provisions of this ¶15.1 and Licensee's obligations hereunder shall survive Termination.

15.2 (a) Licensee shall procure and maintain at all times during which Articles are being sold a public liability insurance policy including products liability coverage with respect to Articles with a limit of liability of not less than the equivalent of US$3,000,000. Such insurance may be obtained by Licensee in conjunction with a policy of products liability insurance that covers products other than Articles.

(b) Each insurance policy required to be maintained by Licensee hereunder ("**Policy**") shall be written for the benefit of Licensee and Licensor and the other indemnitees described in ¶15.1 and shall be designated expressly as primary insurance. Licensee shall deliver to Licensor a certificate of insurance with respect to each Policy and shall furnish to Licensor evidence of the maintenance of each Policy upon request. Each Policy shall provide that it may not be canceled or altered without at least 30 days prior written notice to Licensor.

(c) Nothing contained in this ¶15.2 shall be deemed to limit in any way the indemnification provisions of ¶15.1.

15.3 Licensor hereby saves and holds Licensee and its respective affiliates harmless of and from and indemnifies each of them against any and all losses, liability, damages and expenses (including reasonable attorneys' fees and expenses) that they or any of them may

7

incur or be obligated to pay, or for which they or any them may become liable or be compelled to pay in any action, claim or proceeding against them or any of them, by reason of the fact that Licensee's use of the Licensed Mark strictly in accordance with the terms of this Agreement infringes upon the rights of a third party. The provisions of this ¶15.3 and Licensor's obligations hereunder shall survive Termination.

    15.4    Any person seeking indemnification under ¶15.1 or 15.3 (the "**Indemnitee**") shall use reasonable efforts to give Licensee or Licensor, as the case may be (for purposes of this ¶15.4, the "**Indemnitor**"), notice of any action, claim or proceeding for which indemnification is being sought promptly after the Indemnitee becomes aware of such action, claim or proceeding; provided, however, that the failure of the Indemnitee to provide the Indemnitor prompt notice of any such action, claim or proceeding shall not adversely affect the Indemnitee's rights under this Agreement unless, and then only to the extent, that the Indemnitor is materially prejudiced by such failure. Upon receiving notice of any action, claim or proceeding for which an Indemnitee is seeking indemnification, the Indemnitor, in its sole but reasonable discretion, shall take such action as it deems advisable to defend such action, claim or proceeding on behalf of the Indemnitee. In the event appropriate action is not taken by the Indemnitor within 20 days after its receipt of notice from the Indemnitee, the Indemnitee shall have the right to defend such action, claim or proceeding, in which case the Indemnitor also shall reimburse the Indemnitee for its costs in defending such action, claim or proceeding, but no settlement thereof may be made without the approval of the Indemnitor, which approval shall not be withheld or delayed unreasonably. Even if such appropriate action is taken by the Indemnitor, the Indemnitee may, at its own expense, be represented by its own counsel in such action, claim or proceeding. In any case, the Indemnitee and the Indemnitor shall keep each other fully advised of all developments and shall cooperate fully with each other in all respects in connection with any such defense as is made. The provisions of, and the Indemnitees' and the Indemnitors' respective rights and obligations under this ¶15.4 shall survive Termination.

16.    Defaults; Termination; Reversions

    16.1    (a)    If Licensee fails to make any payment due hereunder, (i) Licensee shall pay interest on the unpaid balance thereof from and including the date such payment becomes due until the date the entire amount is paid in full at a rate equal to the prime rate prevailing in New York, New York, U.S.A. at Citibank, N.A. as of the close of business on the date the payment first becomes due plus 3 percentage points (or the maximum rate of interest that legally can be paid by Licensee, if lower), and (ii) if such default shall continue uncured for a period of ten (10) business days after notice thereof from Licensor, Licensor may terminate this Agreement forthwith by notice to Licensee. Also, Licensee shall be responsible for and shall reimburse Licensor for any and all costs reasonably incurred by Licensor in seeking to collect any sums due to Licensor hereunder, including reasonable attorneys' and collection agency fees and expenses.

    (b)    If Licensee otherwise fails to perform any of the terms, conditions, agreements or covenants in this Agreement on its part to be performed or takes any action, or fails to take any action, which action or omission is materially harmful to Licensor, and if such default continues uncured for a period of 20 business days after notice thereof has been given to Licensee by Licensor, then Licensor, at its sole election, may terminate this Agreement forthwith by notice to Licensee.

    16.2    Notwithstanding the provisions of ¶16.1(b), Licensor shall be entitled to terminate this Agreement immediately upon notice to Licensee, upon the occurrence of any one or more of the following events:

       (a)    If Licensee suspends production, offer for sale, presentation or marketing activities of a full line of Licensed Products for any period in excess of 120 consecutive days following the First Annual Period and Licensee fails to resume such activities to the satisfaction of Licensor within 30 days after notice from Licensor.

       (b)    If, without the written consent of Licensor, more than 50% of the outstanding shares of stock of the Licensee, or the beneficial interest therein, or substantially all of Licensee's assets, is transferred or disposed of, or if Licensee is a party to a merger, consolidation or reorganization pursuant to which Licensee is not a surviving party.

       (c)    If Licensee ceases or takes material steps to cease to carry on its business.

       (d)    If Licensee is unable to meet its obligations as they generally become due.

       (e)    If Licensee intentionally conceals revenues; knowingly maintains false books or records; intentionally defrauds or makes false representations to Licensor; or, knowingly submits any substantially false reports to Licensor.

       16.3    If Licensee files a petition in bankruptcy, is adjudicated a bankrupt or files a petition or otherwise seeks relief under or pursuant to any bankruptcy, insolvency or reorganization statute or proceeding, or if a petition in bankruptcy is filed against it or if it becomes insolvent or makes an assignment for the benefit of its creditors or a custodian, receiver or trustee is appointed for it or a substantial portion of its business or assets, this Agreement shall terminate automatically and forthwith. The events and proceedings set forth above are deemed to include all comparable events and proceedings under the laws of Mexico. Nothing contained herein shall be deemed to preclude or impair any rights which Licensor may have as a creditor in any bankruptcy or other proceeding, provided such proceeding or filing is not vacated within 30 days from such filing. Also, no assignee for the benefit of creditors, custodian, receiver, trustee in bankruptcy, sheriff or any other officer of the court or official (or the equivalent thereof in the Territory) charged with taking over custody of Licensee's assets or business may continue this Agreement or exploit or in any way use the Licensed Mark if this Agreement terminates pursuant to this ¶16.3.

       16.4    Licensor may terminate this Agreement, by notice to Licensee if Net Wholesale Sales during any Annual Period are less than 50% of "Minimum Net Wholesale Sales" for such Annual Period (as provided in <u>Schedule C</u>).

       16.5    If, by the beginning of the third Annual Period, Licensee has not commenced marketing Articles in reasonable commercial quantities in any particular Category, or if Licensee had commenced the marketing of Articles in a Category in reasonable commercial quantities, but, by the beginning of the third Annual Period or at any time thereafter, it ceases doing so, then, in either such case, at Licensor's option and by notice to Licensee, such Category of Articles automatically shall be deleted from the definition of the Products hereunder and all rights granted to Licensee hereunder with respect to such Products automatically shall revert to Licensor.

17.    <u>Rights on Termination</u>

       17.1    Upon Termination, Licensee shall pay to Licensor any sums then owed to it, including any Sales Royalty pursuant to §7 above and any Minimum Royalty pursuant to §6. In addition, (a) the Minimum Royalty and any Minimum Advertising Shortfall Payment remaining unpaid for the Annual Period during which this Agreement terminates plus (b) the Minimum

Royalty payable for the remaining Annual Periods under the initial term or renewal term, as the case may be, shall be accelerated and shall become immediately due and payable to Licensor.

17.2   In addition, upon Termination, Licensee immediately shall deliver to Licensor a complete and accurate schedule of Licensee's inventory of Articles and of related work in process then on hand ("**Inventory**"). With the exception of merchandise which did not meet approvals,, Licensee shall be permitted, for a period of 90 days following Termination, to sell-off the Inventory (the "**Sell-Off Period**"), provided that all such sales are made subject to all of the provisions of this Agreement. All Sales Royalty due for sales of Inventory during the Sell-Off Period shall be accounted for and paid to Licensor monthly.

17.3   Except for the sale of Inventory, on Termination, all of the rights of Licensee under this Agreement shall terminate forthwith and shall revert immediately to Licensor and Licensee immediately shall cease the manufacture, distribution and sale of Articles, discontinue all use of the Licensed Mark and transfer to Licensor, free of charge, all registrations, filings and rights with regard to the Licensed Mark that it may have possessed at any time. In addition, Licensee thereupon shall deliver to Licensor, free of charge, all samples of Articles and all labels and other material in its possession with the Licensed Mark thereon.

17.4   Notwithstanding Termination, Licensor shall have and hereby reserves all rights and remedies that it has, or that are granted to it by operation of law, (i) to enjoin the unlawful or unauthorized use of the Licensed Mark, sale of Articles or any violation of any of Licensee's obligations hereunder, (ii) to collect Sales Royalties, Minimum Royalties, Minimum Advertising Royalty  Shortfall Payments and any other sums payable by Licensee, and (iii) to recover damages for breach of this Agreement. The injunctive relief described in this ¶17.4 may be sought in the courts, notwithstanding the arbitration provisions of this Agreement, and, if applicable, also may be sought prior to or in lieu of Termination or in aid of arbitration. In seeking injunctive relief, Licensor need not secure a bond or other security or prove any actual damages. Also, Licensor may commence an arbitration to recover damages prior to or in lieu of Termination.

18.   Representations and Warranties

18.1   Licensor represents and warrants that it has full right, power and authority to enter into this Agreement and to perform all of its obligations hereunder and that it has granted no other existing license to use the Licensed Mark on Products in the Territory. Except for the foregoing, Licensee acknowledges that Licensor has not made, nor is Licensor herewith or hereby making, any representation or warranty of any kind with respect to Licensor, the Licensed Mark, Articles or the prospects of the business to be conducted by Licensee hereunder.

18.2   Licensee represents and warrants that it has full right, power, authority and financial resources to enter into this Agreement and to perform all of its obligations hereunder and that it has had the opportunity to have this Agreement translated and to provide a copy hereof to legal counsel of its own choosing prior to the execution hereof, has consulted with such legal counsel with respect hereto and the transactions contemplated hereby and has received from such legal counsel an explanation that it deems satisfactory as to the nature and scope of the terms and conditions of this Agreement and Licensee's rights and obligations hereunder.

19.   Notice

19.1   All reports, approvals, requests, demands and notices required or permitted by this Agreement to be given to a party shall be in writing and shall be deemed to be duly given if personally delivered, if mailed (by certified or registered mail, return receipt requested, if such

service is available) or if delivered by internationally-recognized overnight courier or mail service, such as DHL or Federal Express, to the party concerned at the addresses set forth below (or at such other address as a party may specify from time to time in writing):

    If to Licensor:

IP Holdings LLC
103 Foulk Road
Wilmington, DE 19803
Attn: Mike Morgan

    With a copy to:

Iconix Brand Group, Inc.
1450 Broadway, 4th Floor
New York, NY 1008
Attn: Andrew R. Tarshis, SVP/Business Affairs
Fax: (212) 391-0127

    If to Licensee:

Exportaciones del Futuro S.A. de C.V.
Enrique Wallon # 428
Primer Piso
Col. Rincon del Bosque
11580 Mexico, D.F.
Fax: 011 52 55 5876 3133

    With a copy to:

The Law Firm of Jeffrey S. Dweck, P.C.
100 West 33rd Street – Suite 1017
New York, New York 10001

20.    <u>Sublicense; Assignability; Binding Effect</u>

    20.1   Subject to ¶20.2 below, Licensee may, upon obtaining the written consent of Licensor in each instance, which shall not be unreasonably withheld or delayed, sublicense to others the whole or any part of the rights granted to Licensee to use the License Mark under this Agreement; provided, however, that in each and every instance (i) Licensee shall promptly notify Licensor of the name, address and identity of the sublicensee as Licensor may reasonably request, (ii) no such sublicense shall be granted to further sublicense to others, and (iii) Licensee shall be fully responsible for any and all performance under any such sublicense.

    20.2   A sublicense by Licensee pursuant to ¶20.1 shall not operate so as to relieve or discharge Licensee from any of its obligations under this Agreement. To the extent of a sublicense by Licensee hereunder, the term "Licensee", as used in this Agreement, shall be deemed to also refer to the sublicensee to whom Licensee has so sublicensed, as the context may require, except that no such sublicensee shall, itself, be permitted to sublicense its rights hereunder, except upon the express written consent of License in each instance.

    20.3   The performance of Licensee hereunder is of a personal nature and, therefore, neither this Agreement nor any of the rights granted to Licensee hereunder may be assigned, sublicensed (except as otherwise provided for above) or transferred by Licensee and any such attempted assignment, sublicense or transfer, whether voluntary or by operation of law, shall be

void and of no force or effect and shall constitute an uncurable default hereunder. The direct or indirect transfer or issuance of any shares of Licensee shall be deemed a violative assignment hereof and also shall constitute an uncurable default hereunder if such transfer or issuance shall limit or reduce the rights or ability of the current owners of Licensee to control the business and affairs of Licensee.

    20.4    This Agreement shall inure to the benefit of and shall be binding upon the parties, Licensor's successors and assigns and Licensee's permitted successors and assigns.

21.    <u>Arbitration; Court Actions</u>

    21.1    Except as specifically set forth in this Agreement, all disputes, controversies and claims arising out of or relating hereto or concerning the respective rights or obligations hereunder of the parties hereto (except disputes, controversies and claims relating to or affecting in any way the ownership of or the validity of the Licensed Mark or any registration thereof, or any application for registration thereof ("**Licensed Mark Disputes**")) shall be settled and determined by arbitration in New York, New York, U.S.A., before a panel of three arbitrators in accordance with and pursuant to the then existing International Arbitration Rules of the American Arbitration Association. The arbitrators, in their discretion, may award specific performance or injunctive relief and reasonable attorneys' fees and expenses to any party in any such arbitration and the courts also may do so with regard to injunctive relief sought by Licensor pursuant to ¶17.4 and with regard to Licensed Mark Disputes (collectively, "**Court Actions**"). However, in any arbitration proceeding, the arbitrators may not change, modify or alter any express condition, term or provision hereof in any respect, and to that extent the scope of their authority is expressly limited. The arbitration award shall be final and binding upon the parties and judgment thereon may be entered in any court having jurisdiction thereof. The service of any notice, process, motion or other document in connection with an arbitration under this Agreement or for the enforcement of any arbitration award hereunder may be effectuated in the manner in which notices are to be given to a party pursuant to §19.

    21.2    Any Court Action shall be brought in New York, New York, U.S.A., in any court having jurisdiction thereof, except that Licensor also may bring an injunctive proceeding in any jurisdiction where appropriate by reason of the subject matter of the Court Action. Each of Licensor and Licensee hereby irrevocably submits to the jurisdiction of any of said courts located in New York, New York, U.S.A. and any such other jurisdiction in any Court Action and hereby waives any claim or defense of inconvenient forum or lack of personal jurisdiction under any applicable law, decision or treaty or otherwise.

22.    <u>Miscellaneous</u>

    22.1    Licensee shall not give away Articles or sell Articles in connection with any tie-in or marketing or promotional campaign relating to products other than Articles without the prior consent of Licensor.

    22.2    Licensee shall reimburse Licensor for the reasonable and pre-approved travel expenses (<u>i.e.</u>, airfare, lodgings, meals and local transportation) incurred by Licensor's personnel (not to exceed 3) in travel undertaken by Licensor under this Agreement – which shall include travel to the Territory 2 times per each Annual Period.

    22.3    Notwithstanding anything to the contrary contained in this Agreement, Licensor and its affiliates may at any time during the Term negotiate and enter into agreements with third parties pursuant to which any of them may grant a license to use the Licensed Mark in connection with the manufacture, distribution and sale of Products in the Territory, provided that the first sales or presentations for sales shall be a collection after the final collection permitted to be sold by Licensee hereunder; and nothing herein shall be construed to prevent Licensor, its

affiliates or any third party licensee from showing such Products and accepting orders therefore, but only for delivery after Termination.

22.4    This Agreement shall be construed and interpreted in accordance with the laws of the State of New York, U.S.A. applicable to agreements made and to be performed in said State.

22.5    This Agreement contains the entire understanding and agreement between the parties hereto with respect to the subject matter hereof, supersedes all prior oral or written understandings and agreements relating thereto and may not be modified, discharged or terminated, nor may any of the provisions hereof be waived, orally.

22.6    Nothing herein shall be construed to constitute the parties hereto as partners or as joint venturers, or either as agent of the other, and Licensee may not obligate or bind Licensor in any manner whatsoever. Licensee shall clearly identify itself at each at its business premises and on all materials, including business documents, required by Licensor as an independent licensee of Licensor.

22.7    No waiver by either party, whether express or implied, of any provision hereof, or of any breach or default thereof, shall constitute a continuing waiver of such provision or of any other provision of this Agreement. Acceptance of payments by Licensor shall not be deemed a waiver by Licensor of any violation of or default under any of the provisions of this Agreement by Licensee. Also, if for any reason any acts or omissions by Licensee hereunder not in conformance with any of the requirements hereof are not objected to by Licensor from time to time, such a failure to object shall not be deemed a waiver by Licensor of any such requirement and Licensor may insist upon due performance thereof by Licensee at any time.

22.8    If any provision or any portion of any provision of this Agreement shall be held to be void or unenforceable, the remaining provisions of this Agreement and the remaining portion of any provision held void or unenforceable in part shall continue in full force and effect.

22.9    This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted. Also, as used in this Agreement, the term "including" means "including, but not limited to" unless otherwise specifically provided.

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement as of the day and year first above written.

IP HOLDINGS LLC

By:_____

EXPORTATCIONES DEL
FUTURO S.A. DE C.V.

By:_____

**Execution Copy**

## SCHEDULE A

Licensed Products

Men's, women's and children's apparel and all other products in International Class 25 and 18.

**Execution Copy**

## SCHEDULE B

Minimum Royalties

| Annual Period | Minimum Royalty (6%) |
|---|---|
| First   (Signing to December 31, 2007) | $ 99,000(US) |
| Second (January 1, 2008 to December 31, 2008) | $126,000(US) |
| Third   (January 1, 2009 to December 31, 2009) | $141,000(US) |
| Fourth (January 1, 2010 to December 31, 2010) | $165,000(US) |
| Fifth (January 1, 2011 to December 31, 2011) | $180,000(US) |
| Sixth (January 1, 2012 to December 31, 2012) | $195,000(US) |

Case 1:07-cv-04145-LBS    Document 1-2    Filed 05/29/2007    Page 16 of 18

**Execution Copy**

## SCHEDULE C

### Minimum Net Wholesale Sales

| Annual Period | Minimum Net Sales |
| --- | --- |
| First (Signing to December 31, 2007) | $1,650,000(US) |
| Second (January 1, 2008 to December 2008) | $2,100,000(US) |
| Third (January 1, 2009 to December 31, 2009) | $2,350,000(US) |
| Fourth (January 1, 2010 to December 31, 2010) | $2,750,000(US) |
| Fifth (January 1, 2011 to December 31, 2011) | $3,000,000(US) |
| Sixth (January 1, 2012 to December 31, 2012) | $3,250,000(US) |

**Execution Copy**

## EXHIBIT A

### CONTRACTOR AGREEMENT

The undersigned contractor (the "Contractor") has been engaged by _____ (the "Customer") to produce certain products (the "Products") and, from time to time in the future, again may be engaged by the Customer to produce Products for the Customer.

The Contractor acknowledges that certain Products that it now or in the future will be producing for the Customer will be sold under the trademark "MUDD®" and related marks (jointly and severally, the "Trademark").

The Contractor agrees that it will sell the Products bearing the Trademark that it now or in the future will be producing for the Customer only to the Customer unless authorized by the Customer in writing. The Contractor further agrees that, in the event of any overrun or of any termination or non-acceptance of an order for such Products or the return of such Products for any reason, including by reason of late delivery, the Contractor will remove the Trademark prior to its sale or distribution of such Products. Also, in connection with any such sale or distribution, the Contractor agrees that it will not advertise or otherwise publicize the fact that such Products had been produced for the Customer or that they had been produced for sale under or otherwise are in any way connected with the Trademark. Furthermore, the Contractor agrees that it will not, under any circumstances, sell any of such Products into, or to customers located in or with outlets in North America.

The Contractor further agrees that it will not use any child, prison or slave labor or violate any other labor, health, safety or other applicable laws in connection with the production of Products bearing the Trademark.

The Contractor further acknowledges that, other than as permitted above, the sale or production of any Products bearing the Trademark that it now or in the future will be producing for the Customer will result in irreparable damage and injury to the Customer for which it may not have any adequate remedy at law. Accordingly, the Contractor agrees that the Customer may have the provisions of this agreement specifically enforced and may obtain both temporary and permanent injunctions prohibiting any unapproved sales or prohibited employment practices. The Contractor acknowledges and agrees that this right and remedy is in addition to, and not in lieu of, any other rights and remedies available to the Customer under law or in equity.

DATE: _____, 200_

_____
(FILL IN COMPANY NAME OF CONTRACTOR ON LINE)

BY:_____
         (SIGN ON LINE)

TITLE:_____

TELEPHONE:_____

TELEFAX NO._____

ADDRESS:_____