# STAMELL & SCHAGER, LLP

### ATTORNEYS AT LAW
ONE LIBERTY PLAZA, 35TH FLOOR
NEW YORK, NEW YORK 10006-1404

WRITER'S E-MAIL:

stamell@ssnyc.com

WRITER'S DIRECT DIAL:
(212) 566-4051

TELEPHONE (212) 566-4047
FACSIMILE (212) 566-4061

October 25, 2007

**ECF Filed**

The Honorable Leonard B. Sand, U.S.D.J.
United States District Court for the Southern District of New York
500 Pearl Street
New York, NY 10007

> Re:  *Exportaciones del Futuro S.A. de C.V. v. Iconix Brand Group, Inc., et al.*,
> **Index No. 07 CIVIL 4145 (LBS)**
> **Request for Amendment of Order and Judgment**

Dear Judge Sand:

We represent plaintiff and are writing to request, pursuant to Rule 59(e), that the Court reconsider and amend its Order and Judgment dismissing Plaintiff's complaint to address two claims for relief that defendant moved to dismiss but which are not are not mentioned in the Order and Judgment. Plaintiff also requests that the Court amend the Order and Judgment to allow Plaintiff to amend the Complaint.

Plaintiff asserted three claims for relief: (1) breach of contract; (2) interference by Defendant Iconix with the contract; and (3) interference with prospective business advantage between Plaintiff and Future Exports, Inc., a non-party. (The Complaint is attached as Exhibit A.) The Order states that "all claims" are dismissed, but does not explain whether or why the second and third claims are dismissed. (The Order is attached as Exhibit B.) In particular, the third claim for relief (interference with prospective business advantage) does not depend on the existence of the contract which this Court held was subject to a statute of frauds defense. Plaintiff therefore respectfully requests that the Court amend its Order and Judgment to state whether and for what reasons the Court dismissed the second and third claims for relief.

Plaintiff also requests leave to amend the Complaint to allege facts to satisfy the statute of frauds standard stated by this Court, consisting of new paragraphs 26, 27, and 28, as well as a new paragraph in the third claim:

1) Defendants signed the contract between the parties,

2) The contract was the execution copy and defendants kept it;

3) The contract that Defendants signed was in writing and contained all the terms of contract (thereby satisfying the Statute of Frauds as well as the *Adjustrite* factors); and;

October 25, 2007
Page 2

4) Plaintiff would have entered into one or more agreements with Future Exports had Defendants not interfered with the business relationship.

(Amended Complaint is Exhibit C.)

Respectfully,

Jared B. Stamell

cc: Debra Karlstein, Esq.

# EXHIBIT A

Jared B. Stamell (JS 5225)
STAMELL & SCHAGER, LLP
One Liberty Plaza, 35th Floor
New York, New York 10006
(212) 566-4047

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EXPORTACIONES DEL FUTURO S.A. DE C.V., :

Plaintiff,                                :

      v.                              :

ICONIX BRAND GROUP INC. and              :
IP HOLDINGS, LLC,

                              :

Defendants                               :



07 CIV 4145

JUDGE SAND

**COMPLAINT AND**
**JURY DEMAND**

     Plaintiff alleges upon information and belief, except for allegations pertaining to those that are made on personal knowledge:

### JURISDICTION AND VENUE

    1.  This Court has diversity jurisdiction under 28 U.S.C. § 1332 because all of the parties reside in jurisdictions diverse to one another, and because one of the parties is a citizen of a foreign state.

    2.  Plaintiff, Exportaciones del Futuro S.A. de C.V. ("EF" or "Plaintiff"), is a corporation under the laws of Mexico, having its principal place of business in Mexico.

    3.  Defendant Iconix Brand Group, Inc. ("Iconix"), is a corporation under the laws of the State of Delaware, having its principal place of business in New York.

4.  Defendant IP Holdings, LLC ("IP"), is a limited liability company, created under the laws of the State of Delaware, having its principal place of business in New York. (Iconix and IP are collectively referred to here as "Defendants").

5.  The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

6.  Venue is proper under 28 U.S.C. § 1391 because defendant Iconix has its principal place of business in the State of New York, and because the events and omissions giving rise to Plaintiff's claim occurred within the State of New York.

## PLAINTIFF

7.  EF, the Plaintiff, is a corporation that manufactures, markets, and distributes products in Mexico.

8.  Plaintiff's primary offices are at Enrique Wallon # 428 Primer Piso, Col. Rincon del Bosque, 11580 Mexico, D.F. Mexico.

## DEFENDANTS

9.  Defendant Iconix is a corporation that is in the business of licensing trademarks, such as the Mudd trademark.

10. Iconix's principal place of business is 1450 Broadway, 4th Floor, New York, New York 10018.

11. Defendant IP is a limited liability company wholly owned and controlled by Iconix.

12. IP's principal place of business is 1950 Broadway, 4th Floor, New York, New York 10018.

13. Iconix controls IP and uses IP to hold title in trademarks that IP owns.

2

## FACTS

### The Agreement

14. Plaintiff entered into an exclusive licensing agreement for the manufacture, marketing, and distribution of the "Mudd" line of fashion clothing in Mexico with Defendants.  Defendants refused to perform, ordered Plaintiff not to perform, and entered into a second, conflicting agreement with another entity.

15. Mr. Joseph Gershon ("Gershon") is a principal of Plaintiff.

16. In early 2006, Gershon entered into an oral agreement with Iconix to determine whether it would be profitable to exploit the Mudd trademark in Mexico, and, if so, to license the trademark in Mexico for Iconix.  Iconix was represented by Mr. Andrew Tarshis ("Tarshis") and Ms. Gail Tentler ("Tentler").

17. Gershon did the following pursuant to that agreement over a period of several months:

   a.  Traveled within and without Mexico to determine potential markets for products carrying the Mudd trademark;

   b.  Met with potential manufacturers and distributors of Mudd products, and conducted negotiations with these potential manufacturers and distributors;

   c.  Conducted further meetings with Tarshis and Tentler; and

   d.  Traveled to Mexico with Tentler to meet with a company that manufactures denim clothing, known as "Future Exports."   Future Exports was one of the potential manufacturers that Gershon had identified to manufacture "Mudd" branded blue jeans in Mexico.

3

18. Gershon concluded that it would be profitable to sell goods in Mexico under the Mudd trademark, and the parties therefore negotiated an exclusive licensing agreement, under which Iconix licensed Plaintiff to manufacture, market, and distribute the Mudd line of fashion clothing in Mexico (the "Agreement").

19. Defendants were the primary drafters of the Agreement.

20. By early October of 2006, the parties agreed on the final terms and final form of the Agreement. A copy of the Agreement is attached as Exhibit 1.

21. The Agreement grants an exclusive license to Plaintiff to use the Mudd trademark in Mexico, and to manufacture, market, sell, and distribute products using the Mudd mark. *See* Ex. 1 at ¶ 1.

22. The term of the Agreement was approximately three years, nine months, and would have continued through December 31, 2009. *See* Ex. 1 at ¶ 2.1.

23. The Agreement was renewable, at the sole option of Plaintiff, for an additional three years, upon the fulfillment of minimum royalties and sales. *See* Ex. 1 at ¶ 2.2.

24. On October 3, 2006, Tarshis demanded that Gershon execute the Agreement on behalf of Plaintiff immediately and return it to Defendants. Gershon complied, signing and returning the executed Agreement promptly to Tarshis.

25. On October 9, 2006, Gershon received an e-mail note from Tarshis acknowledging receipt of the executed Agreement from Gershon.

26. On the same day, October 9, 2006, Iconix published a press release announcing that it had entered into an Agreement with the Plaintiff. A copy of the press release is attached as Exhibit 2.

27. On October 9, 2006, Reuters and the Associated Press stated that Iconix said it signed a license with Plaintiff to sell Mudd branded clothing, shoes and other products in Mexico.

4

28. Plaintiff performed on the Agreement.   For example, Gershon sought out and negotiated tentative agreements with third parties in Mexico for the manufacture, marketing, and distribution of the Mudd line.

29. Plaintiff at all times was ready, willing, and able to perform under the Agreement.

## Repudiation of the Agreement

30. In October 2006, after the press releases had been issued, Tentler informed Gershon by telephone that Defendants did not want to proceed with the Agreement.  Plaintiff protested and asked Tentler to meet with him.  Plaintiff requested a meeting by e-mail.

31. In late October, one of Plaintiff's potential customers in Mexico informed Gershon that Future Exports – the potential manufacturer with whom Gershon had met regarding the manufacture of Mudd products – claimed that it had an exclusive license for the distribution of the Mudd line in Mexico.

32. In late October or early November of 2006, Gershon telephoned Tarshis and asked whether Iconix had a license agreement with Future Exports for Mudd products.  Tarshis denied that Iconix had an agreement with Future Exports.

33. On November 3, 2006, Tarshis wrote Gershon an e-mail stating that "we have decided that it would not be in the interests of our company to sign a license agreement with you or Exportaciones del Futuro."  The e-mail stated that "we ask that you immediately discontinue any discussions that you may be having with potential customers/suppliers regarding the Mudd brand and cancel any meetings that may have been scheduled in connection therewith."  The e-mail further stated "Please be aware that you no longer have our permission or authorization to represent yourself or Exportaciones del Future [sic] as having a legitimate relationship with our company or the Mudd brand."

5

34. In November of 2006, Gershon wrote to Tarshis and requested an explanation of Defendants' failure to perform. Iconix did not respond until January 16, 2007, when Tarshis sent an e-mail to Gershon stating that the November 3 e-mail had been intended to state that "you had no authority or right to represent yourself or Exportaciones del Futuro as having any legitimate association with the Mudd brand or our company," and that Defendants have retained legal counsel and "have instructed them to proceed with legal action if you do not immediately discontinue all use (and/or mention) of the Mudd brand in your dealings."

35. A third party that operates in Mexico has confirmed to Plaintiff that he has seen a copy of an agreement by Defendants for the manufacture of Mudd brand products in Mexico by Future Exports.

36. Defendants have repudiated the agreement, and by entering into a conflicting agreement, have made it impossible for Plaintiff to perform the Agreement.

## FIRST CLAIM FOR RELIEF
### Breach of Contract by Defendants

37. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 36 of this Complaint as though fully set forth herein.

38. Defendants breached and repudiated the Agreement, and are liable to Plaintiff for the damages Plaintiff has suffered, in an amount to be demonstrated at trial, but at least $5.7 million.

## SECOND CLAIM FOR RELIEF
### Interference with Contract by Iconix

39. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 38 of this Complaint as though fully set forth herein.

40. In October of 2006, Plaintiff and IP entered into the Agreement, which was an advantageous business relationship for Plaintiff.

6

41. To the extent that IP had a separate corporate existence from Iconix, Iconix caused IP to breach and repudiate the Agreement.

42. Iconix therefore interfered with a contract between IP and Plaintiff.

43. Iconix' interference with the contract between IP and Plaintiff was intentional and improper.

44. As a result, Iconix is liable for damages in an amount to be demonstrated at trial, but at least $5.7 million.

### THIRD CLAIM FOR RELIEF
**Interference with Prospective Business Advantage by Defendants**

45. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 44 of this Complaint as though fully set forth herein.

46. Plaintiff had a business relationship with Future Exports, and Defendants knew of this relationship.

47. Defendants intentionally and wrongfully interfered with the relationship between Plaintiff and Future Exports by repudiating the Agreement, and by entering into an exclusive licensing agreement directly with Future Exports.

48. As a result, Defendants are liable for the injury caused, in an amount to be demonstrated at trial.

7

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Adjudging Defendants to be jointly and severally liable to Plaintiff in an amount to be proven at trial, but at least $5.7 million, with interest, and

B.    Such other and further relief as this Court deems just and proper.


Dated:  Thursday, May 24, 2007

STAMELL & SCHAGER, LLP


By:_____
Jared B. Stamell, Esq. (JS 5225)
One Liberty Plaza, 35th Floor
New York, New York  10006
(212) 566-4047

*Attorneys for Plaintiff*

8

## JURY DEMAND

Plaintiff demands trial by jury of all issues triable as of right by a jury.

Dated:   May 24, 2007                    STAMELL & SCHAGER, LLP


By:   _____
          Jared B. Stamell (JS-5225)
One Liberty Plaza, 35th Floor
New York, New York  10006-1404
(212) 566-4047

Attorneys for Plaintiff

9

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
EXPORTACIONES DEL FUTURO                    :
S.A. DE C.V.,                               :
                                            :
                          Plaintiff,        :
                                            :
                                            :        **MEMORANDUM AND ORDER**
                                            :        07 Civ 4145 (LBS)
              v.                            :
                                            :
ICONIX BRAND GROUP INC. and                 :
IP HOLDINGS, LLC,                           :
                                            :
                          Defendants.       :
------------------------------------------------------------x

SAND, J.,

      Before the Court is Defendants' motion to dismiss pursuant to Federal Rule of

Civil Procedure 12(b)(6) in this suit for breach of contract, tortuous interference with the

alleged contract, and tortuous interference with plaintiff's prospective business

advantage.  The underlying facts of this suit stem from a negotiation over a contract for

licensing the "Mudd" trademark to manufacture clothing in Mexico.  Plaintiff alleges that

a contract existed, and that defendants wrongfully breached it.  For the reasons discussed

below, the Court grants the motion to dismiss.

I.  FACTUAL BACKGROUND[1]

      In early 2006, Exportaciones Del Futuro S.A. de C.V. ("Exportaciones") principal

Joseph Gershon entered into an oral agreement with defendants to determine whether it

would be profitable to license their "Mudd" trademark in Mexico.  In order to make that

---

[1] The following facts are drawn from the complaint, except where noted.  Because this is a motion to
dismiss, the Court will consider all material factual allegations as true and draw all reasonable inferences in
favor of the plaintiff.  Lee v. Bankers Trust Co., 166 F.3d 540, 543 (2d Cir. 1999).

determination, Gershon traveled to Mexico to investigate potential markets for Mudd products, met and negotiated with potential manufacturers and distributors, and attended a meeting with defendants' representatives and a denim manufacturer, Future Exports.

After this initial investigation, the parties entered into negotiations for a written agreement that would grant Exportaciones an exclusive license to manufacture, market and distribute the Mudd line of clothing in Mexico. The agreement would have spanned from the date of enactment through December 2009, and was potentially renewable for an additional three year period at plaintiff's option.

On October 3, 2006, defendants asked plaintiff to sign and return the final contract, and plaintiff did so. On October 9, 2006, defendants issued a press release on their website and in trade press announcing that they had entered into a contract with plaintiff. However, defendants did not sign the formal contract. Rather, defendants advised Gershon, both verbally and in writing, that they did not intend to sign the contract.

Plaintiff alleges that defendants made direct contract with a third party, Future Exports, and entered into an exclusive licensing agreement with it. Plaintiff confronted defendants with that information, and defendants denied any such contract. However, defendants refused to comply with the terms of their unsigned contract with plaintiff, and plaintiff has brought this suit for damages based on that alleged breach.

## II.  STANDARD FOR MOTION TO DIMSISS UNDER RULE 12(b)(6)

A court reviewing a complaint under Fed. R. Civ. P. 12(b)(6) will consider all material factual allegations as true and draw all reasonable inferences in favor of the

2

plaintiff. <u>Lee v. Bankers Trust Co.</u>, 166 F.3d 540, 543 (2d Cir. 1999). The complaint will be dismissed "only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." <u>Thomas v. City of New York</u>, 143 F.3d 31, 36-37 (2d Cir. 1998). The court is not limited to the four corners of the complaint; it may also consider "documents attached to the complaint as an exhibit or incorporated in it by reference, ... matters of which judicial notice may be taken, or ... documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." <u>Brass v. American Film Technologies, Inc.</u>, 987 F.2d 142, 150 (2d Cir. 1993).


## III. THE SECOND CIRCUIT'S <u>ADJUSTRITE</u> FACTORS DO NOT SUPPORT FINDING A BINDING CONTRACT

The Second Circuit in <u>Adjustrite</u> set out a four-factor test for determining "whether the parties to a preliminary agreement that called for execution of a formal instrument intended to be bound in the absence of such an executed final instrument." <u>Adjustrite Systems, Inc. v. GAB Business Services, Inc.</u>, 145 F.3d 543, 549 (2d Cir. 1998). In determining whether a binding instrument exists, "[t]he key, of course, is the intent of the parties: whether the parties intended to be bound, and if so, to what extent. <u>Id.</u> at 548-9. The factors to consider in making this determination are as follows:

> (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing.

<u>Id.</u> at 549. Here, defendants concede that factor (3) is satisfied, but argue that the other three factors are not, and thus the Court should not find that the parties intended to be

3

bound in the absence of a formal, signed agreement. The Court agrees that factors 1, 2

and 4 weigh strongly against finding that an agreement exists under these circumstances.

A.  The Language of the Agreement

"The first factor, the language of the agreement, is 'the most important.'"

Adjustrite, 145 F.3d at 549 (citing Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d

69, 72 (2d Cir. 1989)).  Here, the Court agrees with defendants that there are sufficient

indications in the agreement itself that the parties did not intend to be bound before the

agreement was signed.

First, the existence of a merger clause in the agreement strongly suggests that the

parties did not wish to be bound if the agreement was not signed.  See Ciaramella v.

Reader's Digest Ass'n., 131 F.3d 320, 324 (2d Cir. 1997) ("The presence of ... a merger

clause is persuasive evidence that the parties did not intend to be bound prior to the

execution of a written agreement.").

Furthermore, the final draft of the unsigned agreement was marked as the

"Execution Copy," which is evidence that the parties intended to be bound when the

agreement was "executed," and not before.  Cedric Kushner Promotions, Ltd. v. King,

1999 U.S. Dist. LEXIS 90 *1, *4 (S.D.N.Y. Jan. 11, 1999) ("This Court interprets the use

of the terms 'execution' and 'draft' as evidence that the parties did not intend to be bound

in the absence of a signed writing.").

B. Partial Performance

4

The second factor under <u>Asjustrite</u> is whether there has been any partial performance of the agreement. No evidence of partial performance exists here. Plaintiff contends that Gershon's travels in Mexico and meetings with potential manufacturers and distributors equate to partial performance of the contract. But plaintiff's complaint makes clear that these actions were undertaken in order "to determine whether it would be profitable to exploit the Mudd trademark in Mexico," before the parties even agreed to negotiate the terms of the ultimate licensing agreement. (Compl. ¶ 16-17). Such activity cannot be interpreted as partial performance on a contract that had not yet been negotiated. <u>See Multi-Juice, S.A. v. Snapple Beverage Corp.</u>, 2006 WL 2548475 *1, *6 (S.D.N.Y. Sept 1, 2006) ("it is much more likely" that plaintiffs' conduct was "in anticipation of finalizing a written distribution agreement" rather than partial performance of an alleged unsigned agreement.").

C. Type of Contract

"The fourth and final factor is whether the Agreement is the type of contract that is usually committed to writing." <u>Adjustrite</u>, 145 F.3d at 549. In making this inquiry, the Second Circuit noted that courts should consider "the size of the transaction, the nature of the assets being purchased, and the length of the contemplated … contracts." <u>Id.</u> Here, these factors overwhelmingly suggest that this type of contract would be put into a formal writing. The contract was an exclusive license in a foreign country, worth potentially millions of dollars, and lasting up to six years. (Compl. at ¶ 22-23, Schedule B). This is clearly the type of contract that would ordinarily be memorialized in a formal written agreement. <u>See Adjustrite</u>, 145 F.3d at 549 (holding that a "million-dollar acquisition"

involving employment contracts that spanned five years was "clearly was of the type that ordinarily would be committed not only to a writing but to a formal contract complete with representations and warranties and the other standard provisions usually found in sophisticated, formal contracts.").

In sum, although the parties admit that they agreed to the terms of the agreement, the other three factors in the <u>Adjustrite</u> test patently indicate that the parties did not intend for their agreement to be binding before the contract was signed. Accordingly, this Court finds that the parties did not intend to be bound before the agreement was signed.

## IV.  STATUTE OF FRAUDS

Even setting aside the <u>Adjustrite</u> factors, the agreement is still barred by the Statute of Frauds. New York's Statute of Frauds states that "[e]very agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking … [b]y its terms is not to be performed within one year from the making thereof."  NY Gen. Oblig. Law § 5-701(a).  Because the licensing agreement would have spanned a minimum of three years, it is subject to the Statute of Frauds and therefore unenforceable unless in writing.

Plaintiff attempts to circumvent the writing requirement by arguing that defendants' press release announcing the contract can be used to demonstrate that defendants admitted the existence of the agreement, thereby satisfying the Statute of

Frauds.[2] The Statute provides that "[t]here is sufficient evidence that a contract has been made if" one of four exceptions applies and the contract is a "qualified financial contract" as defined in the statute.

"Under Section 5-701(b)(2) a 'qualified financial contract' includes, among other things, agreements for the purchase and sale of foreign currency, currency and commodity options and swaps, and the sale or trade of indebtedness." Argent Elec., Inc. v. Cooper Lighting, Inc., 2005 U.S. Dist. LEXIS 18689 *1, *17 (S.D.N.Y. Aug. 31, 2005). See also § 5-701(b)(2) (listing specific contracts which constitute "qualified financial contracts"). The licensing agreement at issue here is not a "qualified financial contract" because it does not fall under any of the categories enumerated in the statute. Because it is not a qualified financial contract, none of the exceptions in section (b) apply to defendants' press release.

Finally, even if the exceptions in section (b) did apply, defendants' press release would not suffice to satisfy the Statute of Frauds' requirements.[3] The Statute states that a contract will be enforced without a writing if "[t]here is a note, memorandum or other writing sufficient to indicate that a contract has been made, signed by the party against whom enforcement is sought or by its authorized agent or broker."[4] NY Gen. Oblig. Law § 5-701(b)(3). The Statute also notes that a "note, memorandum or writing is not insufficient because it omits or incorrectly states one or more material terms agreed upon, so long as such evidence provides a reasonable basis for concluding that a contract was

---

[2] Although plaintiff cites only case law for this proposition, the Court will assume that plaintiff means to argue that the press releases entitles them to statutory exemption from the writing requirement under § 5-701(b).

[3] Because the contract cannot satisfy the writing requirement under the Statute of Frauds, the Court need not consider whether delivery of the written contract is also required.

[4] Because the Statute clearly indicates that a writing may be signed by an "authorized agent," the Court concludes that defendants' argument that the press release cannot be used to satisfy the Statute of Frauds because it was not signed by IP Holdings must fail.

7

made." Id. However, although it may omit "one or more" material terms, the additional writing still must contain at least *some* of the "essential terms" of the contract in order to satisfy the Statute of Frauds. See Spencer Trask Software & Info. Servs. LLC v. Rpost Int'l, Ltd., 383 F. Supp. 2d 428 (S.D.N.Y. 2003) (holding that the Statute of Frauds exception for judicial admissions did not apply because "the defendants did not make any admission regarding the precise terms of the alleged agreement"); Concordia Gen. Contr. v. Peltz, 11 A.D.3d 502 (N.Y. App. Div. 2004) ("[t]he defendant's admission of the existence and essential terms of the oral agreement was sufficient to take the agreement outside the scope of the Statute of Frauds") (internal quotation marks omitted); Fleet Bank v. Pine Knoll Corp., 290 A.D.2d 792 (N.Y. App. Div. 2002) ("A party seeking to avoid application of the  statute of frauds must demonstrate some exception thereto, such as an admission by the other party to the essential terms and actual existence of the oral contract"); Carter, Macy & Co. v. Matthews, 220 A.D. 679 (N.Y. App. Div. 1927) ("In order to satisfy the requirements of the Statute of Frauds the written note or memorandum must include all the terms of the completed contract which the parties made") (quoting Poel v. Brunswick-Balke-Collender Co., 216 N.Y. 310 (N.Y. 1915)).  Defendants' press release, although acknowledging the existence of a contract, contains none of its essential terms and therefore cannot satisfy the writing requirement under the Statute of Frauds.


V.  CONCLUSION

For the reasons stated above, all claims against defendant Iconix Brand Group Inc and IP Holdings LLC are DISMISSED.


8

SO ORDERED.


Dated:          New York, New York

                October 10, 2007

                                    _____
                                                U.S.D.J.

# EXHIBIT C

Jared B. Stamell (JS 5225)
STAMELL & SCHAGER, LLP
One Liberty Plaza, 35th Floor
New York, New York 10006
(212) 566-4047

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

EXPORTACIONES DEL FUTURO S.A. DE C.V., :
:                    Case No. 07 CIVIL 4145
:                    (LBS)
Plaintiff,                    :
:
v.                    :
:
ICONIX BRAND GROUP INC. and    :    AMENDED **COMPLAINT**
IP HOLDINGS, LLC,                    :
:
Defendants                    :
:

---

Plaintiff alleges upon information and belief, except for allegations pertaining to those that are

made on personal knowledge:

### JURISDICTION AND VENUE

1.  This Court has diversity jurisdiction under 28 U.S.C. § 1332 because all of the parties reside in

jurisdictions diverse to one another, and because one of the parties is a citizen of a foreign state.

2.  Plaintiff, Exportaciones del Futuro S.A. de C.V. ("EF" or "Plaintiff"), is a corporation under the

laws of Mexico, having its principal place of business in Mexico.

3.  Defendant Iconix Brand Group, Inc. ("Iconix"), is a corporation under the laws of the State of

Delaware, having its principal place of business in New York.

4. Defendant IP Holdings, LLC ("IP"), is a limited liability company, created under the laws of the State of Delaware, having its principal place of business in Delaware. (Iconix and IP are collectively referred to here as "Defendants").

5. The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

6. Venue is proper under 28 U.S.C. § 1391 because defendant Iconix has its principal place of business in the State of New York, and because the events and omissions giving rise to Plaintiff's claim occurred within the State of New York.

## PLAINTIFF

7. EF, the Plaintiff, is a corporation that manufactures, markets, and distributes products in Mexico.

8. Plaintiff's primary offices are at Enrique Wallon # 428 Primer Piso, Col. Rincon del Bosque, 11580 Mexico, D.F. Mexico.

## DEFENDANTS

9. Defendant Iconix is a corporation that is in the business of licensing trademarks, such as the Mudd trademark.

10. Iconix's principal place of business is 1450 Broadway, 4th Floor, New York, New York 10018.

11. Defendant IP is a limited liability company wholly owned and controlled by Iconix.

12. IP's principal place of business is 1950 Broadway, 4th Floor, New York, New York 10018.

13. Iconix controls IP and uses IP to hold title in trademarks that IP owns.

2

## FACTS

### The Agreement

14. Plaintiff entered into an exclusive licensing agreement for the manufacture, marketing, and distribution of the "Mudd" line of fashion clothing in Mexico with Defendants.  Defendants refused to perform, ordered Plaintiff not to perform, and entered into a second, conflicting agreement with another entity.

15. Mr. Joseph Gershon ("Gershon") is a principal of Plaintiff.

16. In early 2006, Gershon entered into an oral agreement with Iconix to determine whether it would be profitable to exploit the Mudd trademark in Mexico, and, if so, to license the trademark in Mexico for Iconix.  Iconix was represented by Mr. Andrew Tarshis ("Tarshis") and Ms. Gail Tentler ("Tentler").

17. Gershon did the following pursuant to that agreement over a period of several months:

    a. Traveled within and without Mexico to determine potential markets for products carrying the Mudd trademark;

    b. Met with potential manufacturers and distributors of Mudd products, and conducted negotiations with these potential manufacturers and distributors;

    c. Conducted further meetings with Tarshis and Tentler; and

    d. Traveled to Mexico with Tentler to meet with a company that manufactures denim clothing, known as "Future Exports."   Future Exports was one of the potential manufacturers that Gershon had identified to manufacture "Mudd" branded blue jeans in Mexico.

3

18. Gershon concluded that it would be profitable to sell goods in Mexico under the Mudd trademark, and the parties therefore negotiated an exclusive licensing agreement, under which Iconix licensed Plaintiff to manufacture, market, and distribute the Mudd line of fashion clothing in Mexico (the "Agreement").

19. Defendants were the primary drafters of the Agreement.

20. By early October of 2006, the parties agreed on the final terms and final form of the Agreement. A copy of the Agreement is attached as Exhibit 1.

21. The Agreement grants an exclusive license to Plaintiff to use the Mudd trademark in Mexico, and to manufacture, market, sell, and distribute products using the Mudd mark. *See* Ex. 1 at ¶ 1.

22. The term of the Agreement was approximately three years, nine months, and would have continued through December 31, 2009. *See* Ex. 1 at ¶ 2.1.

23. The Agreement was renewable, at the sole option of Plaintiff, for an additional three years, upon the fulfillment of minimum royalties and sales. *See* Ex. 1 at ¶ 2.2.

24. On October 3, 2006, Tarshis demanded that Gershon execute the Agreement on behalf of Plaintiff immediately and return it to Defendants. Gershon complied, signing and returning the executed Agreement promptly to Tarshis.

25. On October 9, 2006, Gershon received an e-mail note from Tarshis acknowledging receipt of the executed Agreement from Gershon.

26. On or about October 9, 2006, Defendants executed the Agreement.

27. Defendants kept the fully-executed Agreement in their files, and did not return a copy of the fully-executed version to Plaintiff.

25. 28.    The fully-executed Agreement contained all the terms of the agreement between the parties.

26. 29.    On the same day, October 9, 2006, Iconix published a press release announcing that it had entered into an Agreement with the Plaintiff.  A copy of the press release is attached as Exhibit 2.

27. 30.    On October 9, 2006, Reuters and the Associated Press stated that Iconix said it signed a license with Plaintiff to sell Mudd branded clothing, shoes and other products in Mexico.

28. 31.    Plaintiff performed on the Agreement.   For example, Gershon sought out and negotiated tentative agreements with third parties in Mexico for the manufacture, marketing, and distribution of the Mudd line.

29. 32.    Plaintiff at all times was ready, willing, and able to perform under the Agreement.

### Repudiation of the Agreement

30. 33.    In October 2006, after the press releases had been issued, Tentler informed Gershon by telephone that Defendants did not want to proceed with the Agreement.  Plaintiff protested and asked Tentler to meet with him.  Plaintiff requested a meeting by e-mail.

31. 34.    In late October, one of Plaintiff's potential customers in Mexico informed Gershon that Future Exports – the potential manufacturer with whom Gershon had met regarding the manufacture of Mudd products – claimed that it had an exclusive license for the distribution of the Mudd line in Mexico.

32. 35.    In late October or early November of 2006, Gershon telephoned Tarshis and asked whether Iconix had a license agreement with Future Exports for Mudd products.  Tarshis denied that Iconix had an agreement with Future Exports.

5

33.36.    On November 3, 2006, Tarshis wrote Gershon an e-mail stating that "we have decided

that it would not be in the interests of our company to sign a license agreement with you or

Exportaciones del Futuro." The e-mail stated that "we ask that you immediately discontinue any

discussions that you may be having with potential customers/suppliers regarding the Mudd brand and

cancel any meetings that may have been scheduled in connection therewith." The e-mail further stated

"Please be aware that you no longer have our permission or authorization to represent yourself or

Exportaciones del Future [sic] as having a legitimate relationship with our company or the Mudd

brand."

34.37.    In November of 2006, Gershon wrote to Tarshis and requested an explanation of

Defendants' failure to perform. Iconix did not respond until January 16, 2007, when Tarshis sent an e-

mail to Gershon stating that the November 3 e-mail had been intended to state that "you had no

authority or right to represent yourself or Exportaciones del Futuro as having any legitimate association

with the Mudd brand or our company," and that Defendants have retained legal counsel and "have

instructed them to proceed with legal action if you do not immediately discontinue all use (and/or

mention) of the Mudd brand in your dealings."

35.38.    A third party that operates in Mexico has confirmed to Plaintiff that he has seen a copy

of an agreement by Defendants for the manufacture of Mudd brand products in Mexico by Future

Exports.

36.39.    Defendants have repudiated the agreement, and by entering into a conflicting agreement,

have made it impossible for Plaintiff to perform the Agreement.

## FIRST CLAIM FOR RELIEF
### Breach of Contract by Defendants

~~37.~~40.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through ~~36~~39 of this Complaint as though fully set forth herein.

~~38.~~41.    Defendants breached and repudiated the Agreement, and are liable to Plaintiff for the damages Plaintiff has suffered, in an amount to be demonstrated at trial, but at least $5.7 million.

## SECOND CLAIM FOR RELIEF
### Interference with Contract by Iconix

~~39.~~42.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through ~~38~~41 of this Complaint as though fully set forth herein.

~~40.~~43.    In October of 2006, Plaintiff and IP entered into the Agreement, which was an advantageous business relationship for Plaintiff.

~~41.~~44.    To the extent that IP had a separate corporate existence from Iconix, Iconix caused IP to breach and repudiate the Agreement.

~~42.~~45.    Iconix therefore interfered with a contract between IP and Plaintiff.

~~43.~~46.    Iconix' interference with the contract between IP and Plaintiff was intentional and improper.

~~44.~~47.    As a result, Iconix is liable for damages in an amount to be demonstrated at trial, but at least $5.7 million.

## THIRD CLAIM FOR RELIEF
### Interference with Prospective Business Advantage by Defendants

~~45.~~48.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through ~~44~~47 of this Complaint as though fully set forth herein.

7

46-49    Plaintiff had a business relationship with Future Exports, and Defendants knew of this relationship.

50. Defendants intentionally and wrongfully interfered with the relationship between Plaintiff and Future Exports by repudiating the Agreement, and by entering into an exclusive licensing agreement directly with Future Exports.

51.

Had Defendants not interfered with the relationship between Plaintiff and Future Exports, Plaintiff would have entered into agreements with Future Exports for the manufacture of goods.

48. As a result, Defendants are liable for the injury caused, in an amount to be demonstrated at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Adjudging Defendants to be jointly and severally liable to Plaintiff in an amount to be proven at trial, but at least $5.7 million, with interest, and

B.    Such other and further relief as this Court deems just and proper.

Dated: Thursday, October 25, 2007

STAMELL & SCHAGER, LLP

By:_____
        Jared B. Stamell, Esq. (JS 5225)
One Liberty Plaza, 35th Floor
New York, New York  10006
(212) 566-4047

*Attorneys for Plaintiff*

8